# CIRCUIT COURT NO. 2 OF BALTIMORE CITY.

Filed April 22, 1909.

NEWBOLD T. LAWRENCE ET AL.
VS.
CATHERINE WINTER GILLETT, ET AL.

*Arthur W. Machen, Jr.,* and *J. Kemp Bartlett* for plaintiffs.

*Isaac Lobe Straus* and *Arthur W. Machen* for defendants.

SHARP, J.—

The bill in this case was filed to obtain a decree for the administration in this Court, of the personal estate of the late Henry Winter and for other relief. The parties to the case are the executors of Henry Winter and the legatees under his will.

A decree was passed on May 18th, 1907, in which the Court assumed jurisdiction of the administration of said estate. The executors administered the estate in these proceedings in the usual way. On January 14th, 1909, an auditor's account was stated (accounted C). To this account exceptions were filed, and the present controversy arises out of these exceptions.

The facts are as follows: Henry Winter, a resident of Howard county, in the State of Maryland, died January 4th, 1905. He left a will dated April 28th, 1904, in which he gave all of his property, including his property in the State of California, to his sister, Eliza Winter Gillett, for life, remainder to her children. The testator further provided "to my son, Harry Winter, I give nothing, I disinherit him," etc. Arthur W. Machen, Esq., and the Safe Deposit and Trust Company were appointed executors. The will was duly proven and offered for probate by the executors in the Orphans' Court of Howard county. Notice of an intention to file a caveat was given by Harry Winter, the son.

Negotiations then took place between the attorneys for Harry Winter and the attorneys for the legatees and executors and a compromise was arranged.

By an agreement dated January 28th, 1905, plaintiff's Exhibit B, between Harry Winter and the legatees under the will, it was agreed that the executors should assign and transfer to Archibald H. Taylor, Esq., and the American Security and Trust Company, the sum of $50,000, to be held by them in trust for Harry Winter during

his life, remainder to his two children. It was further agreed the executors should transfer to the Safe Deposit and Trust Company $25,000, in trust for Harry Winter for life, remainder to Mrs. Gillett, and other legatees under the will.

In consideration of such transfers Harry Winter agreed to withdraw further opposition to the probate of the will.

The will was admitted to probate, and letters testamentary granted to the executors on January 24th, 1905. On February 18th, 1905, the bill in this case was filed, and by a decree dated May 18th, 1907, the Court assumed jurisdiction of the administration of the estate.

In the decree in this case the executors were directed by the Court to carry out the agreement made by the legatees with Harry Winter and transfer to the trustees named, the sums stipulated in the agreement. This was accordingly done. Harry Winter died in the Fall of 1906. The $25,000 transferred to the Safe Deposit and Trust Company for his benefit for life, has accordingly passed to Mrs. Gillett and the other parties entitled to the remainder, and need not be further referred to.

The testator, among other property, left bonds of the Northern Pacific Railway, general lien, 3 per cent. bonds, par value $50,000, appraised in the inventory at 76, or $38,000. These bonds, together with $4,543.30 in cash, were at the time of the testator's death, in the hands of J. P. Morgan & Company, of New York, for what purpose does not appear.

The bonds and cash were delivered to the executors. There was no administration on the estate of Henry Winter in New York. It was, however, required before the transfer could be made to the executors that the collateral inheritance tax of five per cent., provided by the laws of New York, should be paid, which was accordingly done. The N. P. Bonds were afterwards sold by the executors.

Mr. Winter also owned at the time of his death, some real estate in the City of San Francisco, 1,000 shares of the capital stock of the Spring Valley Water Company, and 656 shares of the capital stock of the San Francisco Gas and Electric Company. These companies were incorporated under the laws of California.

The laws of California did not permit the transfer of the title of this property to the executors without administration on Mr. Winter's estate in California. Ancillary letters of administration were, therefore, taken out in San Francisco by Mr. Machen, one of the executors.

Mr. Machen, the California administrator, sold the stock in the San Francisco Gas and Electric Company. He passed a final account as administrator in the Superior Court of San Francisco on the 27th day of April, 1908. In this account the real estate in California was distributed to the devisees in Mr. Winter's will, real estate, by the laws of that State, passing through the hands of executors.

The personalty consisting of 1,000 shares of the Spring Valley Water Company, and the proceeds of the sale of the 656 shares of San Francisco Gas and Electric Company stock, amounting, together with some arrears of income, to $58,864.30 was then transferred by the administrator to the executors in this State. The administrator was required to pay, before the administration could be closed, and the transfer made, the collateral inheritance tax of five per cent., provided by the laws of California.

It appears that the certificates of stock, in the corporations referred to, were not in the possession of Mr. Winter at the time of his death. In whose possession they were, and for what purpose, does not appear.

The executors treated the stock in the California corporation and the cash received from the California administrator, also the Northern Pacific Railway bonds, and money they received from New York, as a part of the estate in their hands for administration. They sold the N. P. bonds.

An auditor's account was stated by the executors in these proceedings on June 18th, 1908, in which these items were accounted for. A distribution of part of the estate was made in that account. The stock in the Spring Valley Water Company was distributed to the legatees in kind. There was also a distribution of cash.

In arriving at the cash balance for distribution the money received from the California administrator and from the proceeds of the sale of the Northern Pacific bonds, and the sum received from New York, were treated as part of the estate to be distributed. This account was ratified and the property distributed by the executors to those entitled as provided in the account.

On January 14th, 1909, auditor's account C was filed. In this account the auditor charged the legatees with the collateral inheritance tax of 2½ per cent. (Code, Article 81, Section 102) on the $50,000, paid under the agreement of the 20th of January, 1905, (filed in these proceedings as Plaintiff's Exhibit B, on the 18th of February 1907) .................$1,250.00

$5,254.99 interest paid on
  said fund under said
  agreement ..............    131 37
$53,156.51 distributed to re-
  siduary legatees..........  1,318 91
                         $2,700 28

The item of $53,156.51 distributed to the legatees was the cash balance for distribution by the executors. This was distributed in the account filed June 18th, 1908, as already stated. In arriving at this balance the executors were charged with the cash received from the California administrator and with the sale of the N. P. bonds, and the money received from New York. This account, in effect, therefore, charges the legatees with the collateral inheritance tax on these sums.

Exceptions were filed by the legatees and executors to Accounts C.

The grounds of these exceptions are as follows: The Maryland Code, 1888, Article 81, Section 102 (Code 1904, Article 81, Section 117), provides "All estates, real, personal and mixed, money, public and private securities for money of every kind passing from any person who may die seized and possessed thereof, being in this State" * * * "To any person or persons" * * * "other than to or for the use of the father, mother, husband, wife, children and lineal descendants of the deceased" * * * "shall be subject to a tax of 2½ per centum on every hundred dollars," etc.

It is contended by the legatees:

1. That the sum paid the trustees of Harry Winter did not pass to the legatees so as to be liable to the Collateral Inheritance Tax.

2. That by the terms of the statute the Collateral Inheritance Tax is payable only on property "in this State." That the stock in the California corporations and the bonds of the Northern Pacific Railway, and the money in New York and California were not "in this State" at the time of the testator's death, and are, therefore, not taxable under the statute.

The State of Maryland has intervened by petition and has been made a party to this case. The Attorney-General has appeared on behalf of the State.

So far as the first contention is concerned, little need be said. The collateral inheritance tax is not payable on the $50,000, paid by the executors to the trustees for Harry Winter under the agreement of the 18th of February, 1907.

The liability of such a sum to the collateral inheritance tax has never been decided in Maryland, but there are convincing authorities from other States.

Peppers Est., 159 Pa. St. 511.

The facts were similar to the present case: Pepper died in 1892 leaving a will. After stating that his sons, Edward Pepper, was amply provided for by the trust estate, left to him by his grandfather, the late George Pepper, the testator gave his property to certain legatees. The son filed a caveat to the will.

A compromise was arranged and he withdrew all claim to the personal and real estate on the payment to him of $25,000. The State of Pennsylvania claimed that this sum was liable to the payment of the collateral inheritance tax. The Court below disallowed the claim of the State.

In the opinion of the lower Court, which was adopted by the Supreme Court in affirming the judgment, it was decided: The collateral inheritance tax is imposed by the Act of 1887, only upon such portion of the estate of a testator or intestate as passes at his death to the persons, etc., other than

lineal descendants or ancestors described in the act.

In this case, if the will was allowed to stand, the entire estate is liable to the tax; but the only son of the testator, and to whom no bequest was made, for the reason stated in the will, that he was already amply provided for, filed a caveat to contest the validity of the will." * * *

"The question now arises whether the legatees are liable not only to the collateral tax upon the balance of their legacies, but also to that upon the amount they agreed to pay the caveator in compromise and settlement. We have reached the conclusion that, under the most favorable construction of the Act, so far as respects the contention on behalf of the commonwealth, they are not so liable, and for the reason that the amount of the caveator was never received by them as legatees, and, under the Act, it is only so much of the estate which actually passes to them by virtue of the will that is liable to the tax. It will readily be seen if the contest instituted by the caveator had been successful he would be entitled, under the Interstate Law, to the entire estate, and freed from the tax. But instead of further litigation he accepted a portion of the estate, relinquished his claim to the balance, and thus, of course reduced the amount passing to the legatees, and, in fact, to the extent of the amount he received, the will is a nullity. So that all the legatees take is the amount of their bequest, after deducting the sum paid the caveator. And this they concede is subject to the tax."

"This, we think, is the proper construction to be placed upon the Act of Assembly. A contrary view would not only be inequitable, but work a hardship upon legatees and distributees, and surely it was never contemplated thus to impose a double burden. And, it may be suggested, the compromise is infinitely more to the interest of the Commonwealth than if the terms of the settlement were reversed, viz: The will set aside, the entire estate received by the caveator and then he paid the legatees, as a gratuity, the amount they now receive. No tax whatever would then be paid, And, as is shown in Kerr's estate, to Dist. R., 535, affirmed the next case, the payment to the caveator simply re-

duced the estate afterwards passing to volunteers, with the same effect as if the reduction had been caused by the payment of debts, or if the payment or surrender had been the result of a suit terminating in favor of the claimant."

See also Kerr's Est., 159 Pa. 512; Hawley's Est., 214 Pa., 527; Page vs. Rives, 1 Hughes, U. S. C. C., 299.

The exception of the legatees and executors to the allowance of the collateral inheritance tax on the $50,000, paid by the executors to the trustees for Harry Winter, and to the arrears of income will be sustained.

It is next contended that the property, bonds and cash, received from New York, and the stock in the California corporations, and money in California, were not "in this State," and therefore under the terms of the statute were not taxable.

It is contended these words mean, property actually or constructively in the testator's possession and custody, "in this State," at the time of his death, if a chattel, or tangible property, that it must be physically "in this State." If intangible property the evidence of indebtedness must be "in this State." This is too narrow a construction of the statute.

In construing the words "being in this State," in Article 81, Section 117, of the Code, the nature of the tax must be considered. The collateral inheritance tax is not a tax on the person.

State vs. Dalrymple, 70 Md. 294.

While in one sense it is a tax on the property bequeathed, yet to be exact, it is a tax on the right to the succession.

In State vs. Dalrymple, 70 Md., 295, it was held: "It necessarily follows that the State in allowing property actually located here, or personal property situated elsewhere, but owned by a resident, to be disposed of by will, and in designating who shall take such property where there is no will, may prescribe such conditions not in conflict with or forbidden by the organic law, as the legislature may deem expedient.

These conditions, subject to the limitation named, are, consequently, wholly within the discretion of the General Assembly. The act we are now considering plainly intended to re-

quire that a person taking a benefit of a civil right secured to him under our laws, should pay a certain premium for its enjoyment.

In other words, one of the conditions upon which strangers and collateral kindred may acquire a decendant's property, which is subject to the dominion of our laws, is that there shall be paid out of such property a tax of 2½ per cent. into the Treasury of the State.

This, therefore, is not a tax upon the property itself, but is merely the price exacted by the State for the privilege accorded in permitting property so situated, to be transmitted by will or by descent or distribution."

It is important in this case to observe that the testator, the executors and the legatees (or most of them) were domiciled in this State. The will under which the legatees took was made and probated in this State. There was no administration on Mr. Winter's estate in New York.

The California administrator did not make any distribution to the legatees. His action ended with the transfer of the personal property to the executors in this State.

The N. P. bonds were sold by the executors. The property was distributed by the executors to the legatees in these proceedings. In other words the succession to the property took place under and by virtue of the laws of this State.

State vs. Dalrymple, 70 Md., 299.

Lowndes vs. Cooch, 87 Md., 478.

The words "being in this State" must, in view of the nature of the tax, certainly refer to, and include all property the succession to which took place under, and by virtue of the laws of this State.

The property referred to in this controversy was, for all the purposes of succession, actually in this State. The legatees did not acquire any title to the property by virtue of the laws of New York or California. Their title was acquired through the executors in this State and in these proceedings. The tax, therefore, is payable.

The exceptions of the executors and legatees to the allowance of the tax on the property and money received from New York and California will be overruled.